Filed 7/25/13  P. v. White CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

|  |  |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>WILLIAM WHITE,<br><br>Defendant and Appellant. | C069675<br><br>(Super. Ct. No. SF113757A) |

A jury found defendant William White guilty of assaulting his wife Willie Ruth Dean with a deadly weapon, to wit an extension cord, on December 19, 2009 (Pen. Code,[1] § 245, subd. (a)(1); count 1); making criminal threats on December 19, 2009 (§ 422; count 2); attempting to murder Dean on January 3, 2010 (§§ 187, subd. (a), 664; count 3); inflicting corporal injury on Dean on January 3, 2010 (§ 273.5, subd. (a); count 4); and contempt of court (§ 166, subd. (c)(1); count 6).  The jury found defendant not guilty of second degree robbery (§ 211; count 5) but guilty of the lesser included offense of petty theft (§ 484) on January 3, 2010.  The jury also found true allegations

---

[1]     Further undesignated statutory references are to the Penal Code.

defendant personally inflicted great bodily injury under circumstances involving domestic violence in the commission of counts 3 and 4 (§ 12022.7, subd. (e)), personally used a deadly weapon in the commission of counts 2, 3, and 4 (§ 12022, subd. (b)(1)), and acted with deliberation and premeditation in the commission of count 3. In a bifurcated proceeding, the trial court found true allegations defendant had four prior serious felony convictions (§§ 667, subd. (d), 1170.12, subd. (b)) and served two prior prison terms (§ 667.5, subd. (a)).

Sentenced to 61 years to life in state prison, defendant appeals.[2] He contends the trial court erred in (1) failing to instruct the jury sua sponte on attempted voluntary manslaughter as a lesser included offense of attempted murder, and (2) admitting evidence of a prior act of domestic violence. He also asserts his trial counsel was ineffective in failing to move to suppress certain evidence. Finding no error on the part of the trial court or defendant's trial counsel, we shall affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Prosecution's Case in Chief*

Defendant and Dean had a short term relationship in the mid-1970's that produced a son, Chris. Dean later had another son, Adrian. Defendant and Dean kept in touch "[o]ff and on over the years" and married in 2007.

On December 19, 2009, defendant and Dean were living at 5288 Barbados Circle in Stockton. When Dean returned home from work that evening, defendant was there but

---

[2]    Defendant was sentenced as follows: 25 years to life for attempted murder (count 3), plus a consecutive 4 years for inflicting great bodily injury and a consecutive 1 year for use of a deadly weapon; a consecutive 25 years to life for assault with a deadly weapon (count 1); a concurrent 6 months for petty theft (count 5); a concurrent 6 months for contempt of court (count 6); and a consecutive 6 years for the prior prison terms. The trial court struck defendant's conviction for inflicting corporal injury on a spouse (count 4) as duplicative of count 3, and stayed defendant's sentence for making criminal threats (count 2) under section 654.

2

his truck was not. Defendant told Dean the truck had gotten a flat tire. After dinner, Dean prepared to take defendant to get his truck. When defendant told Dean that she would "need to pay to get the truck," Dean told him that she did not have money to pay to get the truck and returned home. Later that evening, as Dean was watching television, defendant walked over to their Christmas tree, picked up an extension cord, and said, "I got to do what I got to do." He then walked toward Dean with the cord stretched tightly between both of his hands. Fearing defendant was going to strangle her, Dean began screaming for help. A struggle ensued. Dean eventually ran outside and used a neighbor's cell phone to call police. During the struggle, Dean ended up with the extension cord and dropped it on the lawn when she got outside. Meanwhile, defendant took Dean's keys and drove away in the Mercury Sable Dean used as her personal vehicle. The Mercury was purchased after defendant and Dean were married in 2007. Dean told the police officer who responded to her call that defendant had stolen her car. The police officer discussed obtaining an emergency protective order with Dean, and Dean indicated she wanted one. The officer was unable to locate an extension cord at the scene. Later that evening, Dean had a friend change the locks on her security door to keep defendant out.

Between December 19 and 25, 2009, defendant, who was living in a homeless shelter, telephoned Dean at least five times wanting to return home. She declined, telling him that she could not trust someone who tried to kill her and that she was divorcing him.

Between December 19, 2009, and January 3, 2010, defendant came by Dean's home three or four times. The first time was sometime prior to December 26, 2009, and Dean's son Adrian served him with the emergency protective order.

About a week after the incident, Dean boxed up all of defendant's personal items and placed them outside.

On December 29, 2009, Dean filed for divorce, and her son Adrian served defendant with the papers.

3

Sometime prior to January 3, 2010, the Mercury Sable was returned to Dean's driveway. She assumed defendant left it there because that is what she had asked him to do. She notified the police the car had been returned.

On January 2, 2010, defendant telephoned Dean and asked her to take him to church with her the following day. She said, "No," and they exchanged words.

The next morning, Sunday, January 3, 2010, Dean prepared to go to church. As she walked out the door, she was carrying her bible bag and purse. As she was about to turn away from the door, she "felt blows" on the top and back of her head. She looked and saw that it was defendant who was hitting her. The two scuffled and eventually ended up on the lawn in front of Dean's and her next door neighbor's home. Dean sustained additional blows to her face, head, right eye, arms, legs, and chest. She had no idea what defendant was using to strike her; however, it did not feel like a punch, it felt like she was being hit with an object. She attempted to shield herself with her hands and arms. While she was lying on the grass, defendant took her purse and car keys and drove off in the Mercury.[3]

Dean ended up across the street but had no idea how she got there. A neighbor heard dogs barking, looked outside, and saw Dean lying on the sidewalk. Dean had been beaten. She was covered in blood and told her neighbor defendant had hit her with something as she was coming out of her house on her way to church.

Stockton Police Officer Scott Fogg responded to a report of "a person beat." When he arrived, Dean was lying on the sidewalk in front of 5291 Barbados Circle. She was not in good condition. Blood was coming from a wound to the back of her head, her arms were "swollen and deformed," and she was bleeding profusely from a cut below her right eye, which was swollen shut. Dean told Fogg who had hurt her, and Fogg "radioed

---

[3]     During cross-examination, Dean acknowledged that she did not actually see defendant take these items from her.

4

to all the cars, hey, this is our suspect." He provided a description of defendant and information regarding the Mercury, including the license plate number. He also advised the other officers that defendant likes to hang out at Mariani's Liquors.

Stockton Police Officers Greg Olmstead and Neto Urias responded to Fogg's call and arrived at Mariani's at the same time. Defendant was standing next to the Mercury in the parking lot. Olmstead drew his gun and ordered defendant to his knees, and defendant complied. Defendant identified himself and was taken into custody. He had blood on his hands and clothing and did not appear to be injured. Stockton Police Officer John Hernandez also responded to Fogg's call and arrived as defendant was being taken into custody.

After defendant was taken into custody, Officer Olmstead returned to the Mercury and saw what appeared to be blood on the exterior of the driver's side of the car. Officers Olmstead and Hernandez searched the passenger compartment of the Mercury. Olmstead searched the driver's side and saw what appeared to be blood on the interior of the door, the steering wheel, and the center console. Hernandez searched the passenger side and did not find anything of interest. Thereafter, Hernandez searched the trunk where he found a small, wooden bat that appeared to have blood on it and Dean's purse. At the time he searched the Mercury, including the trunk, Hernandez knew there had been an assault and that defendant may have been involved.

In June 2007, Dean's brother was living with Dean and defendant. Dean's brother and defendant got into a fight, Dean got involved, and defendant "scraped" her on the arm with a knife. Dean does not know whether defendant intended to hurt her. The police were called, but Dean did not want to press charges because she believed the fight was between defendant and her brother. As a result of the injury to her arm, Dean has "tingling and numbness and nerve damage and muscle damage" to three fingers on her right hand.

5

B.    *The Defense*

Defendant testified on his behalf at trial. On the evening of December 19, 2009, he was illegally dumping some building materials in an area off of Highway 99 and observed Dean's Mercury and a male friend's truck parked up the street. Dean and her friend left in their respective vehicles after observing defendant. When defendant went to leave, he discovered his truck had a flat tire. A man at a nearby Home Depot drove him home.

Dean returned home later that evening and asked defendant where his truck was located. Defendant responded that Dean knew where the truck was because she had seen defendant earlier that evening. Defendant dropped the topic when Dean began waving around a kitchen knife she was using to cut lettuce. After dinner, they left to get defendant's truck but never made it past the driveway. When defendant informed Dean he needed money to have the tire repaired, she said she was not going to give him anything and went back inside.

Later that night, Dean asked defendant if he planned to finish decorating their Christmas tree, and defendant responded, "I guess I got to do what I got to do." As defendant got to work on the tree, Dean came at him with a kitchen knife. Defendant grabbed an extension cord to protect himself. He wrapped the cord around Dean's hands and pushed her. They both fell over, and defendant's wrist was cut in the process. Dean got up and ran out the door. Defendant did not call the police because he did not want Dean to lose her nursing license. He wanted to let things cool down, so he left in the Mercury. He denied taking any money from Dean's purse, explaining that he had $40 in his pocket that day.[4] Dean called him later that night, and he told her he would bring the car back as soon as he got his truck fixed. He returned the car two or three days later.

_____

[4]    Defendant previously testified that he "didn't have any money at that time."

6

Between December 19, 2009, and January 3, 2010, Dean called defendant nearly every day. She invited defendant over three or four separate times, but defendant told her he "want[ed] to get away, get back to me fish."

Dean called defendant on January 2, 2010, to remind him that January 3d is their son's birthday. She also told him that if he got to her home in time, she might let him go with her to church the next day.

The following day, January 3, 2010, defendant arrived at Dean's home at 8:00 a.m. and waited outside. When he heard Dean inside the garage, he knocked on the garage door and told her he was outside. She said, "Okay." Dean came outside a few minutes later, placed her purse and another bag in the trunk of the Mercury, and moved the car from the driveway to the street. As Dean walked back to the house, she handed defendant her phone so that he could call his son. Defendant attempted to hand Dean some divorce papers, but she refused to take them.

When Dean came back outside, she had a coat draped over her left arm, and defendant noticed that her demeanor had changed. She had the "[s]ame old crazy look" on her face that she had on December 19, 2009, when she came at him with the knife. As Dean came toward him, she dropped her coat, and revealed she was carrying a knife with a four- to five-inch blade. Defendant told her to put the knife down, and Dean said, "No. You trying to take everything from me. I'm not going to let you take nothing from me." When Dean continued toward defendant, he picked up a little twig and began hitting Dean on the hand so that she would drop the knife. Dean took off "running across the way." Defendant picked up Dean's keys, which she had dropped, got into the Mercury, and attempted to look for her. As he was driving down the street, Dean ran in front of the car and defendant accidently ran her over. Dean was pinned underneath the car, and there was "a lot of blood coming out from under there." Defendant got the jack out of the trunk, jacked up the car, pulled Dean out, placed her on the sidewalk, rang a neighbor's

7

doorbell, drove to the end of the street, and waited a few minutes until he saw someone come out and check on Dean. Then he drove away.

According to defendant, the incident in 2007 was between him and Dean's brother. Dean was "not included." On cross-examination, he acknowledged he was convicted of battery on a spouse, assault with a deadly weapon (a knife), and brandishing a knife as a result of the 2007 incident. He also admitted prior convictions for aggravated robbery, bank robbery, possession of a firearm, voluntary manslaughter, and assault with intent to commit robbery by use of a deadly weapon.

C. *The Rebuttal*

Following his arrest, defendant was interviewed by a police detective. Defendant told the detective he called Dean nearly every day between December 19, 2009, and January 3, 2010. He was upset about having to live at a shelter. He also was upset Dean had filed for divorce, explaining that she had promised his mother she would take care of him for the rest of his life. Defendant spoke to Dean on January 2, 2010, and told her he would be serving her with divorce papers. The next morning, he took a bus from the homeless shelter to Dean's house and waited outside. When Dean emerged from the house, defendant attempted to serve her with the divorce papers. Dean cursed at him and went back inside. When she reemerged a few minutes later, she continued cursing at him, and he felt like he was under attack. He thought Dean had a knife. He "lost it," "blacked out," and did not remember what exactly happened. "[H]e was so frustrated about his living situation and the way that he felt he was being treated by Ms. Dean's son that he couldn't take it anymore, and that this anger had built up inside him so much that he knew that he hurt Ms. Dean very severely and that he was really sorry, but he couldn't help it." He found a stick on the lawn that he used to hit her. After striking her with the stick, he took her car keys and purse and left in the Mercury. When the detective told him no knife was found at the scene, defendant said he must have seen something that resembled a knife, such as Dean's keys. He denied striking Dean with a baseball bat or

8

knowing anything about the bat found in the trunk of Dean's car. He did not say anything about accidentally striking Dean with the car. He repeatedly said he was sorry and offered to and did write Dean an apology letter.

Officer Fogg "walked the scene" within minutes of arriving at Barbados Circle on January 3, 2010, including the grass area in front of Dean's and Dean's next door neighbors' homes, and did not locate a knife. He did observe a large amount of blood in the grass in front of Dean's next door neighbor's home. There were also blood drops from the sidewalk in front of Dean's next door neighbor's home "all the way over to where [Fogg] located Ms. Dean in the driveway/sidewalk area of 5291" Barbados Circle. Fogg did not see a large amount of blood in the street. Nor did he observe any drag marks, just drops of blood.

## I
### The Trial Court Did Not Err in Failing to Instruct the Jury Sua Sponte on Attempted Voluntary Manslaughter as a Lesser Included Offence of Attempted Murder

Defendant contends his conviction for attempted murder (count 3) must be reversed because the trial court failed to instruct the jury sua sponte on the lesser included offense of attempted voluntary manslaughter. More particularly, he asserts "[t]here was substantial evidence of provocation during the period from December 19, 2009 to January 3, 2010, that spilled over into a violent, uncontrollable attack, requiring sua sponte jury instructions on the lesser-included offense of attempted voluntary manslaughter." We disagree.

" ' "The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request." ' [Citation.] 'Conversely, even on request, the court "has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction." ' [Citation.] This substantial evidence requirement is not satisfied by ' "any evidence . . . no matter how weak," ' but rather by evidence from which a jury composed of reasonable

persons could conclude 'that the lesser offense, but not the greater, was committed.' [Citation.] 'On appeal, we review independently the question whether the trial court failed to instruct on a lesser included offense.' " (*People v. Avila* (2009) 46 Cal.4th 680, 704-705, italics omitted.)

Attempted voluntary manslaughter is a lesser included offense of attempted murder. (*People v. Gutierrez* (2003) 112 Cal.App.4th 704, 708.) "The mens rea element required for murder is a state of mind constituting either express or implied malice. A person who kills without malice does not commit murder. Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter. Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' (*People v. Barton* (1995) 12 Cal.4th 186, 201.) Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation. While some measure of thought is required to form either an intent to kill or a conscious disregard for human life, a person who acts without reflection in response to adequate provocation does not act with malice." (*People v. Beltran* (2013) 56 Cal.4th 935, 942, fn. omitted (*Beltran*).) "Provocation is adequate only when it would render an ordinary person of average disposition 'liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' " (*Id.* at p. 957, quoting *People v. Logan* (1917) 175 Cal. 45, 49.)

Here, defendant points to the following as substantial evidence of provocation. Following the December 19, 2009, incident, Dean changed the locks on her security door, placed defendant's belongings outside, and filed for divorce. She also told police defendant had stolen the Mercury even though she knew the car was community property and her report could cause defendant to return to prison after having spent most of the

past 20 years there. Finally, on the morning in question, January 3, 2010, Dean refused to allow defendant to accompany her to church or to accept divorce papers he attempted to serve on her. None of these events is sufficient to "render an ordinary person of average disposition 'liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' " (*Beltran, supra,* 56 Cal.4th at p. 28, quoting *People v. Logan, supra,* 175 Cal. at p. 49; see also *People v. Lujan* (2001) 92 Cal.App.4th 1389, 1413-1414 [no provocation shown where wife separated from defendant, filed for divorce, and enlisted law enforcement assistance in stopping defendant from stalking and harassing her].)

The cases relied on by defendant are readily distinguishable. In *People v. Berry* (1976) 18 Cal.3d 509, 513-514, the victim, the defendant's wife, had engaged in a two-week pattern of sexually arousing the defendant and taunting him into jealous rages over her love for another man. Our Supreme Court found that under those circumstances the trial court erred in refusing to instruct on voluntary manslaughter based on sudden quarrel or heat of passion. (*Id.* at p. 518.) In contrast, here, the evidence indicated Dean sought to break off her relationship with defendant following a physical altercation two weeks earlier. To that end, she changed the locks on her home, served him with divorce papers and an emergency protective order, and rebuffed his request to accompany her to church. While she had reported defendant stole the Mercury, defendant had since returned the car, and there is no indication defendant would suffer any adverse consequences as a result of Dean's report. Dean's actions are nothing like those of the defendant's wife in *Berry.*

Defendant also cites *People v. Borchers* (1958) 50 Cal.2d 321, in support of his contention that heat of passion may be provoked over an extended period of time. *Borchers* is factually distinguishable because the series of events that prompted the defendant to kill in that case included, "[the victim's] admitted infidelity, her statements that she wished she were dead, her attempt to jump from the car . . . her repeated urging

11

that defendant shoot her, [her son], and himself on the night of the incident, and her taunt, 'are you chicken.' " (*Id.* at p. 328-329.) This case presents no similarly egregious provocations, either as extended build-up to the January 3, 2010, assault or as the immediate impetus for it.

In sum, Dean did nothing to provoke defendant so as to permit heat of passion instructions to be given. No reasonable jury could find otherwise. Accordingly, the trial court did not err in failing to instruct the jury on attempted voluntary manslaughter.

II

Defendant's Trial Counsel Was Not Ineffective for Failing to Move to Suppress the Items Found in the Trunk of the Mercury Because the Search Was Proper Under the Automobile Exception

Defendant next contends "[t]he warrantless search of the trunk . . . exceeded the lawful scope of a search incident to arrest; [and] trial counsel's failure to object deprived [defendant] of the Sixth Amendment right to effective assistance of counsel, requiring reversal of counts three [attempted murder] and five [petty theft]." Again, we disagree.

A defendant claiming ineffective assistance of counsel has the burden to show: (1) counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance resulted in prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688 [80 L.Ed.2d 674, 693] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.) Prejudice is shown when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, *supra*, 466 U.S. at p. 694 [80 L.Ed.2d at p. 698].) Where, as here, the claim is based on trial counsel's failure to object or make a motion, a defendant must prove not only the absence of a reasonable tactical explanation for the omission but also that the objection or motion would have been meritorious. (*People v. MacKenzie* (1995) 34 Cal.App.4th 1256, 1272.)

12

Whether a search is unreasonable under the Constitution is a question of law. (*People v. Lawler* (1973) 9 Cal.3d 156, 160.)  Under the California Constitution, the reasonableness of a search and seizure is measured against federal constitutional standards.  (*People v. Woods* (1999) 21 Cal.4th 668, 674.)  Under the Fourth Amendment to the United States Constitution, a warrantless search is presumed to be illegal, subject to a few exceptions.  (*Ibid*.)

Here, defendant does not contest the legality of his arrest or the search of the car's passenger compartment.  Instead, he disputes the legality of the search of the car's trunk incident to his arrest.[5]  Defendant cites *Arizona v. Gant* (2009) 556 U.S. 332 [173 L.Ed.2d 485] (*Gant*) for the proposition that "the warrantless search of the trunk of [his] car exceeded the lawful scope of a search incident to arrest."  In *Gant,* the United States Supreme Court held that the police may "search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search" or "it is reasonable to believe that evidence [relevant to] the offense of arrest might be found in the vehicle."[6]  (*Id*. at pp. 343, 335 [173 L.Ed.2d at pp. 496, 491], fn. omitted.)  We need not consider whether the search of

---

[5]     For purposes of this appeal, we shall assume defendant has standing to challenge the search.  While we sometimes refer to the Mercury as "Dean's car" because she was the primary driver, it is undisputed the Mercury was purchased during Dean's marriage to defendant.  The People do not challenge defendant's standing to challenge the search of the trunk.

[6]     The vehicle search *Gant* authorizes when it is reasonable to believe evidence relevant to the offense of arrest might be found in the vehicle appears to be limited to the "passenger compartment" and "any containers therein," (*Gant*, supra, 556 U.S. at p. 344 [173 L.Ed.2d at p. 496]), and, traditionally, the passenger compartment has not included the trunk (*New York v. Belton* (1981) 453 U.S. 454, 461 fn. 4 [69 L.Ed.2d 768, 775 fn. 4]).  (See also *United States v. Arnold* (E.D.Mich. Sept. 23, 2009, No. 08-20556) 2009 U.S. Dist. LEXIS 87215, *23-*25 [concluding that *Gant* did not authorize a trunk search].)  Accordingly, we analyze the legality of the trunk search under another doctrine.

13

the trunk exceeded the lawful scope of a search incident to arrest because we find it was justified under the automobile exception to the search warrant requirement.

"If there is probable cause to believe a vehicle contains evidence of criminal activity, *United States v. Ross*, 456 U.S. 798, 820-821, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) [(*Ross*)], authorizes a search of *any* area of the vehicle in which the evidence might be found." (*Gant*, *supra*, 556 U.S. 347 [173 L.Ed.2d at p. 498], italics added.) " 'Probable cause means "a fair probability that contraband or evidence of a crime will be found . . . ." ' " (*Alabama v. White* (1990) 496 U.S. 325, 330 [110 L. Ed. 2d 301, 308].) Probable cause to search thus exists when the "known facts and circumstances are sufficient to warrant a [person] of reasonable prudence in the belief that contraband or evidence of a crime will be found . . . ." (*Ornelas v. United States* (1996) 517 U.S. 690, 696 [134 L. Ed. 2d 911, 918].) A probable cause determination "must be based on objective facts that could justify the issuance of a warrant by a magistrate and not merely on the subjective good faith of the police officers." (*Ross*, *supra*, 456 U.S. at p. 808 [72 L.Ed.2d at p. 583].)

Officer Hernandez had probable cause to believe the trunk contained evidence of criminal activity when he searched it. At the time he searched the Mercury, he knew defendant was a suspect in an assault. He arrived at the liquor store just as defendant was being detained. After defendant was taken into custody, Officers Olmstead and Hernandez searched the Mercury. Olmstead saw what appeared to be blood on the exterior of the driver's side of the car. Olmstead also saw what appeared to be blood on the interior of the door, the steering wheel, and the center console. Hernandez searched the passenger side of the car and did not find anything of interest. Thereafter, he searched the trunk where he found a small wooden bat that appeared to have blood on it and Dean's purse. While Hernandez did not testify that he had seen what appeared to be blood on or in the Mercury, it is inconceivable that he was not aware of its presence given that he searched the passenger side of the passenger compartment while Olmstead

14

searched the driver's side. These facts provided Hernandez with probable cause to believe the car contained evidence of criminal activity. (See *People v. Kraft* (2000) 23 Cal.4th 978, 1044 ["Having found a substance suspected to be <u>blood</u>, searching officers clearly had probable cause to believe criminal activity had occurred in the car . . . ."], underscore added.) Accordingly, he could lawfully search "any area of the vehicle in which the evidence might be found." (*Gant, supra,* 556 U.S. 347 [173 L.Ed.2d at p. 498].)

Because Officer Hernandez's search of the trunk was lawful under the automobile exception to the search warrant requirement, we reject defendant's claim that his trial counsel rendered ineffective assistance by failing to move to suppress the evidence found during that search.[7] (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 836 ["Counsel's failure to make a futile or unmeritorious motion or request is not ineffective assistance."].)

### III
### The Trial Court Properly Admitted Evidence Concerning a Prior Incident of Domestic Violence

Finally, defendant argues the admission of evidence concerning a prior incident of domestic violence pursuant to Evidence Code section 1109 violated his federal constitutional rights to due process and equal protection, and such evidence should have been excluded pursuant to Evidence Code section 352. We reject both claims.

The prosecution moved in limine to admit evidence concerning defendant's 2007 convictions for assault with a knife, brandishing a knife, and spousal battery to establish defendant's propensity to commit acts of domestic violence. In support of its motion, the prosecution made the following proffer: On June 27, 2007, Dean's brother heard Dean

---

[7] Because we find the search was lawful under the automobile exception, we need not address the People's claim "[t]he search was proper as an inventory search and as a search incident to arrest . . . ."

15

and defendant arguing in the front room. Dean's brother entered the front room and saw defendant pointing a knife at Dean and heard defendant threatening to kill Dean. When Dean's brother attempted to intervene, defendant pointed the knife at him and threatened to kill him. Fearing defendant was going to stab her, Dean grabbed the knife with both hands and during the process was cut twice on her left forearm. Dean's brother called the police over Dean's objection. When the police arrived, Dean said she did not want to press charges and would not testify or show up in court. She said she just wanted defendant out of her life.

Defendant moved in limine to exclude such evidence because "the defense has not received any reports. Therefore, the defense requests the exclusion of any prior charged or uncharged domestic violence incidents between William White and Willie Dean-White. (Evidence Code, §§ 1109, 352.)"[8] By the time of the hearing, defendant's trial counsel had received information concerning the June 27, 2007, incident and conceded the evidence was admissible under Evidence Code section 1109. The trial court agreed, finding "[i]t is clearly a domestic violence incident in which allegedly the defendant here started out by threatening to harm [Dean] and wound up cutting her . . . ."

Evidence Code section 1109 permits the admission of a defendant's other acts of domestic violence for the purpose of showing a propensity to commit such crimes, subject to certain limitations. (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1233.) More particularly, Evidence Code section 1109, subdivision (a)(1) provides in relevant part: "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is

---

[8]     Pursuant to Evidence Code section 1109, subdivision (b), "In an action in which evidence is to be offered under this section, the people shall disclose the evidence to the defendant, including statements of witnesses or a summary of the substance of any testimony that is expected to be offered, in compliance with the provisions of Section 1054.7 of the Penal Code."

not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." Evidence Code section 352 states: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Defendant argues the admission of propensity evidence under Evidence Code section 1109 violated his federal constitutional rights to due process or equal protection. Similar constitutional challenges have been repeatedly rejected, and courts, including this one, have held the admission of evidence pursuant to Evidence Code section 1109 does not violate a defendant's rights to due process and equal protection. (*People v. Brown, supra,* 192 Cal.App.4th at p. 1233, fn. 14 [admission of evidence pursuant to Evidence Code section 1109 does not violate defendant's right to due process or equal protection]; *People v. Cabrera* (2007) 152 Cal.App.4th 695, 703–704 [admission of evidence pursuant to Evidence Code section 1109 does not violate defendant's right to due process]; *People v. Price* (2004) 120 Cal.App.4th 224, 240 [admission of evidence pursuant to Evidence Code section 1109 does not violate defendant's right to due process or equal protection]; *People v. Escobar* (2000) 82 Cal.App.4th 1085, 1095–1096 [admission of evidence pursuant to Evidence Code section 1109 does not violate defendant's right to due process]; *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1309–1313 [admission of evidence pursuant to Evidence Code section 1109 does not violate defendant's right to due process or equal protection]; *People v. Johnson* (2000) 77 Cal.App.4th 410, 420 [admission of evidence pursuant to Evidence Code section 1109 does not violate defendant's right to due process].) We see no reason to revisit those decisions here.

Defendant also claims that even if the evidence is not constitutionally barred, the trial court abused its discretion by failing to exclude it pursuant to Evidence Code section 352 because "Dean's trial testimony flatly contradicted the prosecution's offer of proof."

According to defendant, "Dean's trial testimony fails to support the trial court's conclusion that the incident involved domestic violence; [and] even if [it] may have, the evidence was so conflicting that it was likely to confuse the issues. The potential prejudice thus outweighed any probative value of the evidence."

This claim was not preserved for appeal. "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion . . . ." (Evid. Code, § 353.) Here, while defendant initially argued the challenged evidence should be excluded because the defense had not been provided with "any reports," at the hearing on the parties' respective motions defendant's trial counsel acknowledged receiving information concerning the June 27, 2007, incident and conceded the evidence was admissible under Evidence Code section 1109. By making this concession, defendant effectively withdrew her prior objection, and thus, failed to preserve the issue for appeal.

Even assuming the issue had been preserved for appeal, it fails on the merits. "We review the correctness of the trial court's ruling at the time it was made, . . . and not by reference to evidence produced at a later date." (*People v. Welch* (1999) 20 Cal.4th 701, 739.) The trial court did not have Dean's trial testimony before it at the time of its ruling. Accordingly, defendant has failed to establish the trial court abused its discretion in admitting the challenged evidence. In any event, Dean's trial testimony was not inconsistent with a finding that the prior incident involved domestic violence. While Dean testified that the dispute initially was between defendant and her brother, she went on to state that she intervened in the dispute, and defendant "scraped" her with a knife, resulting in nerve damage to three of her fingers. Moreover, at trial defendant admitted he was convicted of battery on a spouse, among other things, as a result of that incident.

Evidence concerning the June 27, 2007, incident was properly admitted.

18

DISPOSITION

The judgment is affirmed.

    BLEASE    , Acting P. J.

We concur:

    BUTZ    , J.

    HOCH    , J.